# Exhibit C

1          **UNITED STATES DISTRICT COURT**

2             **DISTRICT OF NEVADA**

3    **THE HONORABLE JAMES C. MAHAN, JUDGE PRESIDING**

4

5

6  RIGHTHAVEN, LLC,

7          Plaintiff,

8  vs.                          **NO. 2:10-CV-1575-JCM-PAL**

9  PAHRUMP LIFE, et al.,        **MOTION HEARING**

10         Defendants.
   _____/

11

12

13         **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

14             WEDNESDAY, JULY 27, 2011

15                 10:00 A.M.

16

17

18  **APPEARANCES:**

19  For the Plaintiff:    SHAWN MANGANO, ESQ.
                          DALE CENDALI, ESQ.

20  For the Defendants:   LAURENCE F. PULGRAM, ESQ.
                          CLYDE DeWITT, ESQ.

21                        J. MALCOLM DeVOY, ESQ.

22  Amicus Curiae:        PROFESSOR JASON SCHULTZ

23

24

25  Reported by:  Joy Garner, CCR 275
                  Official Federal Court Reporter

**Exhibit C**

```
 1        LAS VEGAS, NEVADA, WEDNESDAY, JULY 27, 2011
 2                     10:00 A.M.
 3                  *    *    *
 4              P R O C E E D I N G S
 5
 6        THE CLERK:  This is the time set for
 7   the show cause hearing and plaintiff's motion to
 8   amend or correct complaint, Civil Case Number
 9   2:10-CV-1575-JCM-PAL; Righthaven, LLC versus
10   Pahrump Life, and all others.
11                  Counsel, please note your
12   appearance for the record.
13        THE COURT:  Mr. Mangano.
14        MR. MANGANO:  Good morning, your Honor,
15   Shawn Mangano on behalf of Righthaven.
16        THE COURT:  Thank you.
17        MR. MANGANO:  With me is Dale Cendali
18   who has been admitted pro hac vice.
19        MS. CENDALI:  Thank you, your Honor.
20        THE COURT:  Cendali, is that right?
21        MS. CENDALI:  That's right, your Honor.
22        THE COURT:  Thank you.  All right.
23        MR. PULGRAM:  Good morning, your Honor,
24   for Amicus Democratic Underground, Laurence
25   Pulgram of the law firm of Fenwick and West.
```

Exhibit C

1  With me is Curt Apsal (phonetic) of the

2  Electronic Frontier Foundation.

3           THE COURT:  Yes, sir.

4           MR. SCHULTZ:  Good morning, your Honor,

5  Jason Schultz.  I'm one of the amici as well.

6           MR. DeWITT:  Good morning, your Honor,

7  Clyde DeWitt for Citizens Against Litigation

8  Abuse, Amicus Curiae.  We were allowed to appear

9  based on your order of June 29th.

10           MR. DEVOY:  Good morning, your Honor,

11  J. Malcolm DeVoy of Randazza Legal Group here on

12  behalf of Amicus Media Bloggers Association

13  pursuant to this Court's order.  Thank you.

14           THE COURT:  Yes, sir.  And those of you

15  who have appeared in front of me before know that

16  I welcome the amicus people.  And I want to hear

17  other voices I guess and not to say, well, let's

18  not have a hearing, we'll just decide it on the

19  papers, or whatever.  I always like to give

20  everybody a chance to be heard.  I was going to

21  say something, but if you want to say something

22  first, go ahead.

23           MR. MANGANO:  No.  Go ahead, your

24  Honor.

25           THE COURT:  I've reviewed this with my

**Exhibit C**

1    brain trust.  Let me tell you what I'm inclined

2    to do and I'll give everybody a chance to argue.

3                   Righthaven has been involved in

4    litigation with, you know, in this building, you

5    know, where other judges have decided cases, you

6    know, which are interesting but not necessarily

7    controlling on my thinking.  So as I look at

8    this, though, to cut right to the heart of the

9    matter, and it's kind of a procedural thing, but

10   I don't think Righthaven has standing based on

11   Lujan versus Defenders of Wildlife, 504 U.S. 555

12   at 571.  In footnote 4 it says, the existence of

13   federal jurisdiction ordinarily depends on the

14   facts as they exist when the complaint is filed.

15                   And then there is a follow-up

16   case, which I have somewhere here in my

17   paperwork, Newman-Green versus Alfonzo-Larrain,

18   490 U.S. 826, 109 S.Ct. 2218.  The existence of

19   federal jurisdiction ordinarily -- this is Roman

20   numeral number II in the opinion -- let's see,

21   it's page 2222 of the Supreme Court Reporter and

22   488 of -- no, I'm sorry, it's at page 2222 of the

23   Supreme Court Reporter.

24                   The existence of federal

25   jurisdiction ordinarily depends on the facts as

**Exhibit C**

1    they exist when the complaint is filed.  And then

2    it notes there are two exceptions, the defective

3    under Title 28 USC, Section 1653, defective

4    allegations of jurisdiction may be amended upon

5    terms in the trial of appellate court, and that

6    is to say it again, defective allegations of

7    jurisdiction which suggests that it addresses

8    only incorrect statements about jurisdiction that

9    actually exist and not the affects of the

10   jurisdictional facts themselves.

11              And then the second exception is

12   Rule 21 which has since been amended, but anyway

13   this case where it has been interpreted by the

14   Second Circuit in Herrick, H-E-R-R-I-C-K,

15   Company, Inc. versus SCS Communications, Inc.,

16   251 F.3d, 315 at 329, Second Circuit, a 2001

17   case.  And it says, quote, as a result where the

18   facts necessary to the establishment of diversity

19   jurisdiction are subsequently determined to have

20   obtained all along, a federal court may simply

21   allow a complaint to be amended to assert those

22   necessary facts.  And again the allegations that

23   need to be corrected, then we can correct the

24   allegations, and then treat diversity

25   jurisdictions having existed from the beginning,

**Exhibit C**

1  but no such amendment is possible when the

2  underlying facts (and not merely the pleadings)

3  are inadequate to support federal jurisdiction.

4  For curing jurisdiction in such a circumstance

5  requires more than just changing the pleadings.

6              And the facts here are that, and

7  now I'm going to rely on other decisions as well,

8  but as other courts have found, you know, there

9  was no federal jurisdiction under the agreement

10  with Stephens Media.  So what I'm inclined to do

11  is to dismiss the case based on lack of

12  jurisdiction.  Now I'll be glad to hear whatever

13  people have to say.

14          MS. CENDALI:  Your Honor, may I take

15  the podium?

16          THE COURT:  Yes, ma'am, sure.

17          MS. CENDALI:  Thank you.

18              First off, thank you, your

19  Honor, for granting my pro hac petition and for

20  letting me be here today.

21          THE COURT:  Ms. Cendali, put your right

22  hand on the slant and find the button on the

23  slant.  That's how you adjust the microphone.  So

24  that's your tax dollars at work.  So hit the

25  button again and it will go down.

**Exhibit C**

1          MS. CENDALI:  Does that seem the best

2   angle there?

3          THE COURT:  I think so.

4          MS. CENDALI:  All right, thank you very

5   much.  I had a similar problem once at the United

6   States Supreme Court, and Judge Scalia suggested

7   I lower the podium to the maximum extent possible

8   so I think I'll do the same here today.

9          THE COURT:  Oh, all right, that's fine.

10          MS. CENDALI:  In any case, your Honor,

11   Righthaven does have standing today with regard

12   to the restated and amended Strategic Alliance

13   Agreement.  No court has construed that

14   agreement.  That agreement is on all fours with

15   the Silvers case in the Ninth Circuit.  It is not

16   a bare right to sue but fully grants the right to

17   Righthaven in all rights to the copyrights at

18   issue in this case including the right to sue.

19          THE COURT:  You speaking now of the

20   amendment, is that right?

21          MS. CENDALI:  That's right.

22          THE COURT:  Okay, but we go by the

23   facts as they existed at the time the lawsuit was

24   filed.

25          MS. CENDALI:  So let's focus on that.

**Exhibit C**

1    Your point is that in the Lujan case you need to

2    look at the facts as they existed at the time the

3    complaint was filed.  Well, we have cited cases

4    which our opponents have not tried to distinguish

5    such as --

6              THE COURT:  Oh, just wait, just wait.

7              MS. CENDALI:  Well, such as Valmont,

8    Travelers, Gallans, Novende (all phonetic), all

9    of which accepted post filing facts as giving

10   rise to standing.  And those courts, and I think

11   the Northstar decision in the Northern District

12   of California, a 2011 decision, is particularly

13   helpful and say that --

14             THE COURT:  So you're saying I should

15   follow the Northern District of California rather

16   than the Supreme Court?

17             MS. CENDALI:  No.  The difference is

18   you have to read the rule that, of course, we're

19   not arguing that standing is not to be considered

20   at the time the complaint is filed, but almost

21   all of those cases, and as far as I know all of

22   the cases that have discussed this, have not also

23   dealt with the issue of a motion for leave to

24   amend to supplement the pleadings to plead the

25   new jurisdictional facts.

Exhibit C

1                    In fact, the Haddad (phonetic)

2    case in the Second Circuit specifically noted

3    that while a lot of cases cite the old saw that

4    you need to look at the facts at the time the

5    complaint was filed, they don't deal with the

6    more sophisticated issue of when you have a

7    motion for leave to amend in light of subsequent

8    events.

9             THE COURT:  But I mean the facts have

10   changed?

11            MS. CENDALI:  Yes, the facts have

12   changed, fundamentally have changed.  The

13   business agreement that was originally entered

14   into is no longer the same business agreement

15   that it is today and what the Northstar case in

16   the -- in the --

17            THE COURT:  But I mean what Supreme

18   Court cases say is that allegations, you can

19   change allegations, but you can't -- you can

20   amend, well, where you want additional

21   allegations, but not where you want to change the

22   facts.

23            MS. CENDALI:  But the issue is how you

24   reconcile that with the issue of a motion for

25   leave to amend which we've liberally granted.

**Exhibit C**

1  Again in the Northstar case, it discusses the

2  fact that there the argument, similar to what's

3  being made here by the amici, is that, well, it's

4  too late because we looked at what happened on

5  the day of the original filing, that's all you

6  looked at.

7                    And the court said that this

8  argument elevates form over substance and goes on

9  to say that although there's no published Ninth

10 Circuit authority on this point, courts in other

11 circuits have found that parties may cure

12 standing deficiencies through supplemental

13 pleadings.  And thus, because in that case there

14 was a subsequent assignment that cured in that

15 case the admitted lack of existing standing

16 originally, because there was that subsequent

17 assignment, the court said, I'm going to deny the

18 motion for -- the motion to dismiss and permit

19 the supplemental pleading.

20                    And the court did this for a

21 very practical reason because the alternative, as

22 we know, standing is a jurisdictional issue with

23 dismissal without prejudice.  The complaint can

24 be re-filed tomorrow based on the new restated

25 and amended Strategic Alliance Agreement which

**Exhibit C**

1    has never been viewed by any court, and we would

2    end up delayed but in the same position we are in

3    now, and the courts recognize why go through that

4    as a matter of judicial economy.  Isn't it

5    practical under Rule 15 to permit an amendment?

6    There's relation back under Rule 15, let it amend

7    back, relate back, to the original filing and

8    let's get on with it.

9              There's already been an answer

10   filed.  Let's get to the merits and we'd very

11   much like to get to the merits, your Honor.  So

12   our point is that there is a line of cases.

13   Northstar I thought was helpful because it's

14   2011, and it summarized a lot of the law.

15   There's a line of cases that say, yes, absolutely

16   you need to look at standing at the time of

17   filing, but you also need to read that in

18   conjunction with subsequent facts and a motion

19   for supplemental pleading.

20              And in light of those cases and

21   in light of the practicality, it makes more sense

22   we respectfully submit to accept the

23   supplemental -- or grant our motion for leave to

24   amend and let the case proceed to the merits

25   phase because alternatively your Honor will

**Exhibit C**

```
1    dismiss without prejudice which is the rule and
2    we'll be re-filing, and it will just take that
3    much longer to get to the actual merits of the
4    copyright infringement here.
5                    Thank you.
6            THE COURT:  All right.  Opposition?
7            MR. PULGRAM:  Thank you, your Honor.
8            THE COURT:  Yes, sir.  Mr. Pulgram?
9            MR. PULGRAM:  Yes, sir.
10           THE COURT:  Yes.
11           MR. PULGRAM:  Thank you for allowing
12   the amici to appear because this is an important
13   issue and the particular issue that you have is a
14   slightly progressed version of what has come
15   before the other courts here.  Your Honor is
16   exactly correct that the case should be dismissed
17   for lack of standing under the Lujan line of
18   cases and five cases in this jurisdiction have so
19   held.  Those aren't binding on your Honor as
20   precedent, but we do believe and we'll talk about
21   in a moment about whether they are collateral
22   estoppel.
23               Second, all of those cases have
24   held, as your Honor is stating, that when they
25   not manufacture facts to create jurisdiction,
```

**Exhibit C**

```
1    that was the language used by Judge Dawson in the
2    Mostofi case, which is a final judgment in which
3    he said, plaintiffs and Stephens Media attempt to
4    impermissibly amend the facts to manufacture
5    standing.  That just doesn't work as a matter of
6    federal practice.  And I think the argument being
7    made here is twofold on the part of plaintiffs.
8                    First, we would like to amend
9    even though we can't, and if you don't let us,
10   we'll have to sue again.  And our position, your
11   Honor, is that this is not after a finding that
12   there was no standing because there was no
13   ownership of the copyright.  That is not going to
14   be a dismissal without prejudice and, in fact,
15   those cases that have already dismissed on the
16   basis of lack of ownership of Righthaven, all of
17   which are the five cases before yours, all of
18   those cases also have preclusive effect here, and
19   let me explain if I may.
20                    In the typical situation of a
21   copyright case there are two elements that need
22   to be shown, ownership of a copyright and a
23   copyright.  The element of ownership is an
24   element of the claim.  Now, in addition, the
25   element of ownership is an element of standing.
```

**Exhibit C**

1    And so when Judge Hunt, Judge Dawson, Judge Pro

2    concluded there was no ownership under the SAA in

3    Righthaven, they concluded that an element of the

4    claim of copyright is missing.

5              THE COURT:  And just for the record,

6    SAA is the Strategic Alliance Agreement for the

7    record, but go ahead.

8              MR. PULGRAM:  I'm sorry to use the

9    jargon but exactly right, and that was the

10   agreement that existed at the beginning of this

11   case and, Judge, in the Hoehn case Judge Pro even

12   went on to say that the clarification so-called

13   did not create an ownership interest.  Now it

14   has, therefore, been settled that under the SAA

15   there is no ownership interest in Righthaven and

16   that isn't --

17             THE COURT:  But they respond what about

18   this second -- I'm going to use the wrong

19   terminology -- but the second amendment, if you

20   will, to the Strategic Alliance Agreement?

21             MR. PULGRAM:  So we have --

22             THE COURT:  And understand what I'm

23   saying, I'm saying, okay, I understand these

24   other judges ruled against Righthaven, but now

25   with the second amendment to the Strategic

**Exhibit C**

```
 1   Alliance Agreement, that cures all of that.
 2            MR. PULGRAM:  And the answer to that
 3   is, it does not because it has already been
 4   concluded that under the Strategic Alliance
 5   Agreement whether you amend it later or not,
 6   under the Strategic Alliance Agreement there is
 7   no ownership.  You cannot after a judgment of a
 8   court, of which there have been four saying that
 9   this is no ownership, come back, change the facts
10   and avoid preclusive effect.
11                    And I think there are two cases
12   that I would like to provide to your Honor and
13   your brain trust on this point because we
14   received yesterday a brief at 6:58 in the morning
15   that for the first time addressed this question
16   of collateral estoppel.  We briefed the issue in
17   our June 27th brief.  We got their first brief on
18   this yesterday and, if I may, I'll hand you
19   copies of the cases.
20            THE COURT:  Sure, yes, sir.  Have you
21   provided --
22            MS. CENDALI:  They provided it moments
23   ago, your Honor.
24            THE COURT:  Well, this case I think we
25   originally set for hearing back in May I think,
```

**Exhibit C**

1  and somebody wants to file something and, like I

2  say, it's my preference is I want to hear more

3  rather than less so --

4        MR. PULGRAM:  These are two multiple

5  copies of two cases.

6        THE COURT:  Okay.

7        MR. PULGRAM:  And I did provide them as

8  soon we got copies from Kinko's this morning

9  before the hearing, but the first case is a case

10 out of the Northern District of Illinois, Judge

11 Shadur, and it was affirmed in the Seventh

12 Circuit.  And the place to start is the very last

13 page which is his first decision.

14        And the last paragraph says

15 because Hyperquest is not an exclusive licensee

16 of any of the rights that it now claims, it is

17 without standing to bring the current action.

18 Accordingly both the complaint and this action

19 are dismissed for lack of subject matter

20 jurisdiction.  So just like all the courts and

21 your Honor can find no ownership, no exclusive

22 rights, no standing, to dismiss this, and he

23 calls it lack of subject matter jurisdiction.

24        If you turn to the second page

25 of this, he explains because one of the parties

Exhibit C

```
 1   said, Judge, that was a dismissal without
 2   prejudice, that was just subject matter
 3   jurisdiction.  And in the bottom right-hand
 4   corner, he explains, no, that was with prejudice,
 5   and I'll read that paragraph.
 6              THE COURT:  Yes, sir.
 7              MR. PULGRAM:  By sharp contrast, what
 8   was at issue in this case was not subject matter
 9   jurisdiction in the real sense, but rather the
10   standing, or more accurately the lack of
11   standing, of Hyperquest to file suit in a case in
12   which, one, a copyright indisputably existed and;
13   two, this court had ample power to decide all
14   issues of that copyright's validity and its
15   claimed infringement.  And then he says, in the
16   order, this court rejected HQ's litigative effort
17   definitively and with prejudice because of its
18   lack of standing, not because of the absence of
19   power of subject matter jurisdiction.
20              And so what Judge Shadur said
21   and what the Seventh Circuit said is, I dismissed
22   it because there was no ownership of an exclusive
23   right.  I called it lack of jurisdiction, but
24   it's the part of jurisdiction standing that is
25   about justiciability not about power and,
```

**Exhibit C**

```
 1    therefore, it's a dismissal with prejudice.  And
 2    that's why, your Honor, those decisions by the
 3    other courts have collateral estoppel effect
 4    here, and it's why your Honor when you dismiss
 5    because the SAA has no -- has no ownership
 6    interest in Righthaven, it should be a dismissal
 7    with prejudice.
 8                    Now, the plaintiffs argue we
 9    just want to re-file with this new restated
10    agreement and that's where the second case that I
11    handed you, the Penonia (phonetic) case, comes
12    in.  The plaintiffs have in their brief yesterday
13    cited a lot of cases that say a dismissal for
14    lack of jurisdiction, a dismissal just for lack
15    of jurisdiction, is not collateral estoppel.  So
16    all that Judge Hunt and Judge Mahan decided was
17    there was no jurisdiction because we didn't own
18    the copyright, that's not collateral estoppel.
19                    They cited a lot of cases for
20    that proposition, none of which dealt with
21    ownerships of copyrights, not any, and none of
22    which dealt with this case, the situation where
23    the merits are intertwined with standing,
24    intertwined with jurisdiction, and what the
25    Penonia Farms case shows is that where a court
```

Exhibit C

1   has dismissed a claim based on lack of ownership,

2   that is collateral estoppel, and I would direct

3   the point to the -- the court to the third of the

4   pages of this decision, the paragraph ending

5   two-thirds down on the right-hand side.

6           THE COURT:  I was looking at the head

7   notes.  I'm sorry, the first page?

8           MR. PULGRAM:  On the third page.

9           THE COURT:  On the third page, I'm

10   sorry, let me catch up to you.  Oh, on the

11   right-hand side, yes, sir.

12           MR. PULGRAM:  Right.  At the bottom of

13   that paragraph there is a sentence that begins

14   about seven lines up, the bottom of the last full

15   paragraph.  This court finds that the Southern

16   District of New York Federal Court thoroughly

17   investigated the effect of the 1990 settlement

18   agreement in Penonia Farm's ownership interest in

19   Penonia One, reconsidered the issue in Penonia

20   Two.  Therefore, a court of competent

21   jurisdiction did actually and necessarily

22   determine the standing issue, thus satisfying the

23   second prong of the Yamaha test, and the Yamaha

24   test is the test for issue preclusion.  So what

25   we have is a decision because it decided

Exhibit C

1  ownership that is preclusive.

2              THE COURT:  But their response is,

3  well, we've amended the Strategic Alliance

4  Agreement, now we do have ownership.

5              MR. PULGRAM:  That's right.

6              THE COURT:  And no court has addressed

7  that.

8              MR. PULGRAM:  That's exactly what they

9  say, your Honor, and they say pay no attention to

10  the fact that the agreement that was litigated on

11  which we sued has been conclusively determined to

12  not grant standing.  We are changing nunc pro

13  tunc what happened in the last year-and-a-half,

14  and I know Judge Hunt said, I know Judge Hunt

15  ruled, and I know the DiBiasi decision entered

16  judgment that, quote, the plain language of the

17  SAA conveys the intent to deprive Righthaven of

18  any right save for the right to sue alleged

19  infringers and profits from such lawsuits.

20              I know that's what has been

21  decided to be what happened in this case, but

22  we're changing all of that now.  We're coming in

23  after a judgment was entered, after preclusive

24  effect has been obtained, and we're now creating

25  a new set of facts.  And we want to sue on it,

Exhibit C

1  and we want to sue on the same SAA, the exact

2  same contract.  We're just restating it because

3  we get, when we don't like the decision that has

4  come down in a prior case, to paper over it by

5  changing the language of the contract.

6          THE COURT:  But I mean parties can

7  amend their agreements any time they want to.

8          MR. PULGRAM:  They sure can.

9          THE COURT:  And so here we've got

10 this -- if I can call it the Strategic Alliance

11 Agreement One, Strategic Alliance Agreement Two,

12 and by my count, and you bicker with me and say,

13 no, it's three, or two, or whatever, but now it

14 looks like the third incarnation of the Strategic

15 Alliance Agreement.

16         MR. PULGRAM:  That's right.

17         THE COURT:  No judge has determined

18 this Strategic Alliance Agreement doesn't confer

19 ownership, or I mean there's just no judge has

20 addressed that, no court has addressed that.

21         MR. PULGRAM:  No court has determined

22 whether or not if this had been the original

23 Strategic Alliance Agreement, it could have

24 created ownership, but the courts are not time

25 travelers, and I would respectfully suggest that

**Exhibit C**

```
1    my esteemed New York counsel isn't either such
2    that they can go back to the time that the SAA
3    was entered and decide I know there's been a
4    final adjudication, but the intent was to give
5    Righthaven nothing.
6                   We're changing that after the
7    fact.  We are undoing -- we're undoing the rule
8    on what the SAA meet and we're -- because we can
9    because we want to nunc pro tunc say the
10   opposite.  The Strategic Alliance Agreement issue
11   number three, version number three says, recites,
12   that it is the intention of the parties -- that
13   it was the intention of the parties that
14   Righthaven receive all rights of an ownership and
15   the copyright.  It's been decided exactly the
16   opposite that that's not what the SAA did.
17                   And so if you come in after the
18   fact and you try to rewrite an agreement to
19   create a claim that has already been denied,
20   that's undoing the courts' decisions.  And I
21   think it goes back to the question of what is
22   collateral estoppel issue preclusion about?  And
23   the Supreme Court has made that pretty clear in
24   explaining that the doctrine is invoked by the
25   courts to promote conclusive resolution of
```

**Exhibit C**

1    disputes.

2                    I'm quoting here from Montana

3    versus United States, 440 U.S. 147 at 153.  The

4    doctrine is invoked by the courts to promote

5    conclusive resolution of the disputes thereby

6    protecting parties from the expense of multiple

7    lawsuits, conserving judicial resources, and

8    increasing the reliability and consistency of

9    judicial decisions.  That's exactly why we should

10   only have one adjudication about the SAA in this

11   case and that's exactly why the plaintiffs can't

12   come in after that.

13                   We cited the FM Industries case

14   for the proposition that a party cannot simply

15   amend its agreement to get around a judgment.

16   It's not been responded to by the plaintiffs, and

17   that court specifically was a copyright case

18   where the parties came in after the judgment and

19   they asked for relief.  I think it was under Rule

20   59 or 60, and the court said, no, I'm not going

21   to allow you to change my judgment by rewriting

22   the agreement.  And that's what's happening here.

23                   Now, that's why the procedure

24   says this case is over.  There are other reasons

25   why the substance of the restated agreement

Exhibit C

```
 1    couldn't amount to a claim anyway, and I believe
 2    that is sufficiently before the Court.  Our
 3    procedural position is that your Honor shouldn't
 4    allow them in because Lujan prohibits it and
 5    because all of these other cases were decisions
 6    on the merits.
 7                    If you get past that issue, then
 8    we're talking about whether or not this restated
 9    agreement is real and whether it's something that
10    could be amended, and our position is that it is
11    not.  And our position is that, in fact, this is
12    further propagating or perpetuating the fraud on
13    the court that Judge Hunt explained in his
14    sanctions order.  I don't know if you've had a
15    chance to read it, but it was two weeks ago and
16    he ordered it delivered to every other court in
17    this jurisdiction and in Colorado that had these
18    issues.
19                    The new agreement contradicts in
20    its recitation of intent the express findings
21    that Judge Hunt has made.  It contradicts the
22    prior agreements.  The prior agreements said that
23    after Righthaven was to be given so-called
24    exclusive rights, it was going to license back
25    all-exclusive rights.  That was the SAA.  The
```

**Exhibit C**

1    first amendment, the so-called clarification

2    said, when we said that the license back to

3    Stephens Media was exclusive, we didn't really

4    mean that.  We meant that it was nonexclusive,

5    and they inserted the word "non" and then they

6    said, but Stephens Media has a right to veto any

7    further license or use by Righthaven.

8                    And once Judge Pro rejected that

9    in the Hoehn case, they said, oh, third

10   clarification, now the nonexclusive license back

11   to Stephens Media doesn't have Stephens Media

12   with the right to veto anymore.  So the point is

13   that each of these agreements are just

14   contradictory.  They are not statements of true

15   intent.  They are not what the parties agreed to

16   or were doing.  They are efforts above all else

17   to create some status, some possible patina for a

18   claim, and that's not a basis upon which a new

19   claim can be made here.

20                    I would just add that the

21   restated amendment also contradicts history.  For

22   the last eighteen months, Righthaven has acted

23   exclusively as an agent to sue people.  The

24   restated agreement purports on its face to say

25   during those eighteen months, that was not its

**Exhibit C**

1    status, it was an actual licensee with a right to

2    license people.  And, in fact, we have before

3    your Court, your Honor, a copy of the LLC

4    Operating Agreement for Righthaven, and even that

5    says that its job is to sue people, and at the

6    end of those lawsuits the copyrights will, must,

7    be given back to the party who gave them.

8              The restated agreement would

9    just perpetuate the very fraud for which they

10   were sanctioned, and for that reason even if you

11   assume that there was any basis under Lujan and

12   under collateral estoppel rules that it could be

13   added, even if you assume that, it's not a basis

14   upon which a claim could be made now in this case

15   or in the future.

16             You know, it was interesting to

17   me to read the brief that we received yesterday

18   morning which said that the defendants in this

19   case or my law firm is interested in creating a

20   copyright free zone on the Internet.

21        THE COURT:  A copyright free zone?

22        MR. PULGRAM:  A copyright free zone was

23   the rhetoric, and what's also interesting is that

24   every case that is brought by Righthaven that has

25   gotten to the question of infringement has been

**Exhibit C**

1    lost by Righthaven.  Every single case in which

2    there's been a determination of whether there's

3    infringement or not, at least three have come out

4    at summary judgment to the contrary.

5                     What we are defending, your

6    Honor, what the amici are here about is to

7    establish a shakedown free zone where real

8    lawsuits are filed by real parties who have real

9    grievances and real ownership interest and not by

10   people who can easily file hundreds of actions

11   against the unrepresented, against people who

12   have to go out to get pro bono counsel all over

13   the country in an effort to shakedown nuisance

14   settlements.

15                     That's why we're here and we

16   think that your Honor has before you all the

17   facts to do exactly what you started with today

18   to dismiss this case, to dismiss it with

19   prejudice, and to end this lawsuit by this party

20   under this agreement, the SAA restated or not,

21   against this defendant.

22          THE COURT:  All right.  Thank you, Mr.

23   Pulgram.

24          MS. CENDALI:  Your Honor, may I respond

25   to this, please?

**Exhibit C**

1        THE COURT:  No, you'll get a chance to

2   respond at the end.  I've got another hearing

3   that started twelve minutes ago.

4        MR. PULGRAM:  I apologize, your Honor.

5        THE COURT:  No, no, I mean it just so

6   happens this got continued so often that I wanted

7   to get it on calendar as quickly as possible.

8            Professor, good to see you

9   again.

10       PROFESSOR SCHULTZ:  Good to see you,

11  thank you, your Honor.  I'll try and keep this

12  brief as well.  I want to just add two points in

13  trying to focus a little bit more on copyright

14  policy and the Copyright Act and the Silvers

15  decision because I think from the sort of big

16  picture point of view, I want to make sure that

17  what happens here is consistent for all the

18  cases, not just Righthaven cases, but all

19  copyright cases.

20           So I want to start with one

21  solid reason why it might make sense to dismiss

22  this case and not allow amendment, and that is

23  that one important policy that's in the Copyright

24  Act is that when you have a prevailing party,

25  attorney's fees are available and costs.  And

**Exhibit C**

1    that's something that is used quite often on both
2    sides, both the copyright plaintiffs to get fees
3    when they win and defendants when they win.
4                    And, in fact, you know it's
5    certainly one of the things that is at issue here
6    in a lot of these cases, and so one of the things
7    that I think I saw going on with these amendments
8    was that there's sort of this language about
9    restatement clarification, but I think I agree
10   with you, your Honor, that in some ways it's not
11   a do-over.  It's not like they are trying to do
12   the same thing over and over, but yet a series
13   like, you know, you make a movie, and then a
14   sequel, and then a third one, and you're sort of
15   trying to get it, you know, kind of down the
16   road.
17                    And it actually makes a
18   substantive difference, all right, because if you
19   don't have a valid copyright claim when you file
20   your complaint, then you are subject to fees and
21   costs if you lose and the defendant wins.  And so
22   I think in Section 505 of the Copyright Act,
23   which clearly states that a prevailing party is
24   eligible for fees and costs, that's an important
25   policy that actually would back up a reason for

**Exhibit C**

1   dismissing the case is not just allowing

2   perpetual amendments.

3               The second point that I would

4   like to make is to actually take a look at the

5   Silvers case a little closer as to a few

6   different places where the Ninth Circuit talked

7   about why the rule they instituted was important

8   and actually talked about why Congress passed

9   Section 501(b) specifically in the statute

10  because I think it's easy on some level to say

11  that maybe this new agreement, if you read

12  specific words in it, meets the single line

13  holding in Silvers.

14              But I actually don't think

15  that's true when you look at what the agreement

16  is really trying to do and also what Silvers is

17  trying to do, what the Ninth Circuit en banc

18  decision was trying to do because actually what

19  was interesting to me is how little discussion of

20  Silvers there was in detail in the plaintiff's

21  briefing, and I just wanted to highlight a couple

22  of things that I find there.

23              First is that there's an

24  explicit statement that the Copyright Act does

25  not permit copyright parties to choose third

**Exhibit C**

1    parties to sue on their behalf, and in that

2    specific instance it was that there was an

3    assignment of the bare right to sue.  So the

4    screen writer in Silvers who, you know, the

5    writer had claimed that the movie was copied from

6    her writings.  She got a bare right to sue, and

7    the court said, no, that you don't have standing,

8    but the reason was for this fundamental principle

9    that you can't outsource your enforcement, and

10   that the court talks about the kind of history of

11   who could sue.

12                And I don't want to go into a

13   lecture, but let me just focus on one area which

14   is that originally actually under the 1909

15   Copyright Act, not only did the copyright owner

16   have to be the one who sued, but you couldn't

17   even split up a copyright.  There are lots of

18   different parts of a copyright you can have

19   exclusive rights to reproduce, to distribute, to

20   perform publically a song, or a movie, or

21   something like those little pieces of it, a

22   bundle of sticks as they say in law school,

23   right?

24                And in the 1976 Act, Congress

25   amended it to say actually, okay, we're going to

**Exhibit C**

1   allow you to split that up, but the reason they

2   did it, and Silvers says this explicitly, was

3   because Congress is aware of constraints on

4   commercial dealings, that there were certain

5   kinds of exploitations of the copyright.  Say you

6   wrote a book and someone wanted to make a movie

7   of it, and you wanted to license or give them the

8   rights to do that exclusively over here, but then

9   someone wants to do an audio book over here, and

10  you want to do it a different thing, you are able

11  to split it up in order to kind of exploit the

12  copyright to make more works available, to make

13  money off of it, and that the enforcement that's

14  written into Section 501(b) is to back that up,

15  right, it's to allow people who go out and do

16  business to back it up.

17             So I just wanted to kind of

18  highlight that because when I look at the

19  amendments here, again this is -- I don't mean to

20  sort of, you know, harp on the same point, but it

21  even though in theory they say that Righthaven

22  has this right to exploit the copyright, there's

23  no indication that they're doing anything of that

24  sort that this is really about litigation, and so

25  I wanted to just sort of focus on the Silvers

**Exhibit C**

```
 1  case in those two respects because I think if the
 2  Court were -- I agree actually that there might
 3  be a number of procedural issues in Lujan and all
 4  these other cases.
 5            But if the Court even does get
 6  to this new agreement, I think the Silvers case
 7  actually talks more broadly about why this right
 8  to sue needs to be really held by the same people
 9  exploiting the copyright and not allowed to
10  wander and the copyright to become fragmented.
11  And that's really what Congress's purpose was, so
12  that aligned with the attorney's fees provision,
13  I think are two additional reasons why I agree
14  with your Honor, and I think the decision can
15  focus in the instructions.  So thank you.
16            THE COURT:  All right, thank you.
17                 Mr. DeWitt?
18            MR. DeWITT:  Good morning, your Honor.
19            THE COURT:  Good morning.
20            MR. DeWITT:  As I said, I represent an
21  organization called Citizens Against Lawsuit
22  Abuse, and at their request the single issue I
23  have written on is that Righthaven is a law firm
24  engaged in the unauthorized practice of law.
25  There's only two points I want to make because my
```

**Exhibit C**

1    other counsel here are much more esteemed than I

2    am.

3                    One is I think just for the

4    public, you need to write an opinion in this case

5    and publish it, and I think it's very, very

6    important to the Scaccias and the other ones of

7    the world against whom Righthaven is engineering

8    stickup after stickup after stickup.  And the

9    second point is it's very important this case be

10   dismissed with prejudice both for the claim

11   preclusion, issue preclusion, reasons that my

12   co-counsel has addressed so well, and because if

13   you dismiss it without prejudice, the defendants

14   don't have the resources to appeal.

15                   They don't know how to do this

16   and they don't even have a lawyer.  And so what's

17   going to happen if assuming the Ninth Circuit as

18   I'm confident it would upholds your ruling, then

19   it will just be another stickup.  And it is so

20   important to get to the prejudice issue because

21   just a matter of public policy and a matter of

22   fairness to the defendants in this case and,

23   goodness knows, how many other defendants.

24                   I'm not going to go into what I

25   put in my brief about why it's a law firm engaged

**Exhibit C**

```
 1    in the unauthorized practice of law, but I can
 2    only make -- there's two points that are
 3    important.  One thing that is in my brief, the
 4    attorneys represent Righthaven.  Righthaven
 5    represents Stephens Media.  Okay, Stephens Media
 6    goes to Righthaven and talks to them about the
 7    cases.  It's not a privileged communication.
 8    Righthaven isn't a lawyer, it doesn't claim to be
 9    even though it's a law firm in fact.
10                    And as to all these Strategic
11    Alliance Agreements, the Court needs to look at
12    substance over form.  If you put a duck in a
13    chicken suit, it's still a duck.  And I mean they
14    can write clever language in a Strategic Alliance
15    Agreement, which I'm sure they'll have ten more
16    amendments to in response to the Court's response
17    to what they're doing, but it's not what the
18    agreement says, it's what's really going on.
19                    And what's really going on is
20    Righthaven is a law firm.  It's engaged in the
21    unauthorized practice of law, and it's very
22    important that the Court find that and give the
23    Ninth Circuit a chance to agree with you, which
24    I'm confident that it will for the reasons that
25    are in my brief.  Every state that's addressed
```

Exhibit C

1  this has come to that conclusion, and the cases
2  are all in there.  Otherwise, my esteemed
3  colleagues are doing better than I am, so I'll
4  let them talk.
5          THE COURT:  All right.  Thank you, sir.
6              Mr. Devoy?
7          MR. DEVOY:  Thank you, your Honor.
8          THE COURT:  Yes, sir.
9          MR. DEVOY:  I will be brief.  Recapping
10 what my colleagues have said, I'm specifically
11 addressing the Court's need to not allow
12 Righthaven to have leave to amend its brief.
13 Specifically doing so would be futile.  First of
14 all, it is moot because Righthaven does not have
15 standing and there is no way that amending its
16 complaint will simply cure that.  It cannot go
17 back in time and change this with another
18 amendment to an agreement that has already been
19 found to not confer its standing from a
20 standpoint of justiciability.
21              What Righthaven has done the
22 first time is to put -- to have in its agreement,
23 and now by restating it again, it's put a beard
24 on it as Mr. DeWitt pointed out, and as
25 Righthaven somewhat hypocritically points out by

**Exhibit C**

```
1    arguing about form over substance, Righthaven's
2    relationship with Stephens Media and its lack of
3    ownership of these copyrights is not going to
4    change until its conduct changes, and its conduct
5    is not going to change.  What Righthaven is doing
6    in this case and has been doing in other cases is
7    attempting to create an army of zombie lawsuits,
8    things that have been settled, things that have
9    been set aside, in an effort to undermine this
10   Court's principles of finality and of preclusive
11   effects, and of prejudice in order to keep these
12   lawsuits alive for whatever purpose it's
13   accomplished.
14                   These don't deserve to be alive.
15   They shouldn't be.  They should have all have
16   been dismissed, and in many cases they have been
17   resolved for a point of judgment, yet they are
18   being re-filed under the pretense, the mistaken
19   pretense, that changing an agreement after the
20   fact and after the rights have transferred
21   somehow changes the facts many years in the past.
22   The other problem is that even if Righthaven got
23   everything that it wanted, it wouldn't change the
24   fact that these lawsuits ignore important First
25   Amendment principles.
```

**Exhibit C**

1                Most importantly, every single

2    case where a motion for summary judgment has been

3    brought by counsel, I understand that in this

4    case it hasn't happened because the defendants

5    have been pro per, but when evidence is put on

6    the record, Righthaven has not won a single

7    dispute on fair use because it is not in the same

8    market as content producers, it is in the market

9    of lawsuits.  It is a separate market and unless

10   somebody else is claiming ownership of a

11   copyright and suing on it, it is not competing

12   with Righthaven.

13               Allowing Righthaven to re-file

14   this lawsuit ignores that, and it also allows

15   them to continue on with this enterprise that

16   harms the First Amendment.  It puts people into

17   their basement where they're afraid to talk,

18   they're afraid to entrap one another, and they're

19   afraid to come out and to produce content because

20   it might infringe upon what somebody else has

21   done.  Moreover, and as we represent bloggers as

22   the Media Bloggers Association's counsel, we also

23   have to uphold the provisions of copyright

24   owners.

25               Allowing Righthaven to continue

**Exhibit C**

1    on with this lawsuit and to further amend its

2    complaint harms the interest of legitimate

3    producers of content who own their own content

4    and sue on their own content by retaining

5    attorneys rather than a complex transfer of

6    rights that doesn't transfer anything at all.

7    And Righthaven has done more damage to the

8    interests of intellectual property holders than

9    Perfect Ten, Incorporated, which has filed

10   numerous lawsuits and strengthened the provisions

11   of fair use and given more protections to website

12   operators and Internet hosts.

13            It is important to understand

14   the relationship within the copyright between

15   content producers and content consumers, however,

16   the way that this is being done ignores important

17   First Amendment principles, punishes the most

18   protected kind of speech that we have in public

19   forums, such as the Internet, about public

20   matters of policy, politics, and other issues of

21   debate and tries to commoditize (phonetic) them

22   in what Mr. Schultz characterized as a secondary

23   market for lawsuits.

24            The U.S. Government, it is to

25   nobody's surprise, heavily regulates these

Exhibit C

```
1    secondary markets, and if it intended to create
2    one for copyrights, it would be reflected in the
3    Copyright Act.  To allow amendment of this and
4    for this lawsuit to persist and this model to
5    proliferate undermines these goals, harms the
6    court, harms producers, and it harms people who
7    are trying to exercise their free speech rights
8    guaranteed by the First Amendment.
9                        Thank you.
10             THE COURT:  Thank you.
11                   Ms. Cendali, now you can get a
12   chance to reply.
13             MS. CENDALI:  Thank you.
14                   I will attempt to respond
15   briefly to the gist of the comments.  First, if
16   there is a dismissal, we still believe that the
17   Court should grant our motion for leave to amend.
18   It clearly should be without prejudice.  All the
19   other dismissals in the other district courts in
20   this -- have ruled on this and have done it
21   without prejudice because that is what the law is
22   when it's simply an issue of standing and
23   jurisdiction that doesn't reach the merits.
24                   Second, there's no preclusive
25   effect here.  It's clearly the overriding
```

**Exhibit C**

1    takeaway that I get from especially Mr. Pulgram's

2    argument is that the amici want to prevent this

3    court or any court from ruling on the third

4    version, the restated amendment, and that's

5    because conspicuously absent from their brief is

6    really any challenge to the third amendment of

7    the restated agreement as to why it doesn't

8    comply with Silvers.

9                    No court has ruled on the

10   restated amendment.  That's the bottom line.

11   Because of that to deny us, Righthaven, the right

12   to file a new lawsuit based on a new agreement is

13   violation of due process and it fails the issue

14   preclusion requirement that there has to be an

15   identity of issues.  There's no identity of

16   issues between the restated amendment and the

17   original SSA (sic).

18                    Moreover, the case that Mr.

19   Pulgram mentioned that he copied from Kinko's,

20   presumably heard about before and he sent it to

21   Kinko's for copying, was a summary judgment

22   decision where the court specifically said even

23   in the language read that there was a full

24   opportunity for the court to hear and understand

25   the issues before ruling.  This is a motion to

**Exhibit C**

1   dismiss.  They want to summarily adjudicate on a

2   motion to dismiss fundamental property rights.

3   That's antithetical to both the law and to the

4   constitution.

5                  That's a violation of due

6   process and is not supported by any authority

7   that I am aware of.  Moreover, conspicuously

8   absent from their discussion of other cases is

9   Judge Navarro's decision in Virginia Citizens,

10  and in that case Judge Navarro denied a motion to

11  dismiss and that was not either with regard to

12  the current restated amendment saying that they

13  pled that they had ownership rights and we'll

14  test it out in discovery and see.

15                  I suggest that Judge Navarro's

16  approach is also a very practical approach that

17  this Court should take.  She wrote a very recent

18  opinion.  We'd be happy to provide your Honor

19  with a copy of it if your Honor doesn't have it.

20  It said that, look, if there is an issue on this,

21  let's decide it, you know, after a full

22  development of the record.

23                  Finally, on the issue of the

24  amendment, counsel completely ignores a comment

25  that your Honor made which is that parties always

Exhibit C

```
1    have the right to amend and enter into new
2    agreements, and this is something that the United
3    States Supreme Court in Sprint Communications, a
4    case cited in our recent brief, specifically said
5    there, too -- it wasn't a copyright case, but it
6    was a case similarly where somebody was -- there
7    were aggregators who were suing on various
8    collection cases.
9                    And the Supreme Court said if
10   there was some issue with the assignment, the
11   parties could readily fix it by entering into a
12   new agreement.  So the Supreme Court certainly
13   believes in the freedom of contract and agrees
14   that you are not forever bound to whatever
15   agreement you may have entered into two years ago
16   and have no ability to change that agreement
17   based on guidance from the various courts.
18                    The other thing is that we've
19   heard from our opponents is a lot of talk about,
20   well, you know, you're bad, Righthaven, because
21   you want to file lawsuits and that's a bad thing.
22   And I think that counsel, with respect, totally
23   misconstrues the Silvers case and what it holds
24   because Silvers simply says if all you have is
25   the right to sue, you don't have the right to
```

Exhibit C

1    sue.

2              What Silvers says is that as

3    long as you have any one of the exclusive rights

4    under the copyright law, you have the right to

5    sue that goes with that.  They're turning it on

6    its head and trying to say, well, you can't, your

7    purpose can't ever be as the copyright order to

8    file lawsuits, but Silvers said, look to patent

9    law.  Silvers in the key area of the case says

10   because patent law and copyright law are similar,

11   especially for issues of assignment, it's

12   instructive to look to patent law.

13              And when you look to patent law,

14   you look to what -- the case I believe is highly

15   on point here, which is the SGS Thomson case

16   versus International Rectifier cited in our

17   omnibus brief that we submitted in the course of

18   this briefing, and there Judge Michel, Chief

19   Judge Michel, writing for the federal circuit

20   rejected a very similar argument that you're

21   hearing the professor and others making here with

22   the idea that there's somehow something wrong

23   with exercising as part of your ownership rights

24   the right to bring a suit.

25              The federal circuit found that

**Exhibit C**

 1   the district court erred in granting summary

 2   judgment on the grounds that the patent

 3   assignment in issue was a sham because the sole

 4   purpose was to facilitate litigation -- sole

 5   purpose to facilitate litigation.  The federal

 6   circuit held in so ruling the trial court ignored

 7   the express language of the assignment and in

 8   effect created a new requirement not found in any

 9   case law that a patent assignment must have an

10   independent business purpose.

11                  The motive or purpose of a

12   patent assignment is irrelevant to the assignee's

13   standing to enforce the assigned patent.  This is

14   the key language.  Even a motive solely or

15   expressly to facilitate litigation is of no

16   concern to the defendant and does not bear on the

17   effectiveness of the assignment citing the United

18   States Supreme Court language in discovery

19   records case.  So the idea that there's something

20   wrong with choosing as part of your ownership

21   rights to file lawsuits is fundamentally flawed.

22   And equally fundamentally flawed is the idea that

23   there's something noble about copying other

24   people's intellectual property on the Internet.

25                  These cases will ultimately I

**Exhibit C**

```
 1  hope be decided on the merits where the court can
 2  look at the facts and properly view under the
 3  First Amendment analysis under the fair use test
 4  and see whether, in fact, there's an
 5  infringement.  I was taught if you're taking
 6  somebody else's property wholesale, copying it in
 7  toto, and using it for your own self and selling
 8  ads to make money as a result of it, that's theft
 9  and there's a right to bring that claim.
10          THE COURT:  How many times should you
11  be permitted to amend?
12          MS. CENDALI:  Well --
13          THE COURT:  I mean because, you know,
14  you want to amend your complaint, but we're on
15  the third amendment, frankly, aren't we?
16          MS. CENDALI:  We are, your Honor.
17          THE COURT:  I mean you understand what
18  I'm saying, you didn't amend the complaint, but
19  basically you did because you've amended the
20  agreement.  This is a third incarnation of the
21  agreement.
22          MS. CENDALI:  I don't see any reason to
23  have to amend after this point.
24          THE COURT:  I understand, but should it
25  be with prejudice or without prejudice because
```

**Exhibit C**

```
1    you've had one bite at the apple, two bites at
2    the apple, and now you want a third bite of the
3    apple.
4              MS. CENDALI:  But there's been no --
5    there's been no judicial -- it would be -- it
6    would be --
7              THE COURT:  It would be, it's the third
8    amendment, isn't it?  I mean I know you haven't
9    amended the complaint three times, but you've
10   amended the contract three times -- two times.
11             MS. CENDALI:  But there's been no --
12   but there's been no judicial ruling as to whether
13   the amended contract provides standing.  They
14   can't have it two ways.  Look at it this way --
15             THE COURT:  No, but answer my question.
16             MS. CENDALI:  Okay.
17             THE COURT:  Right?  This is the
18   third -- I mean you had one amendment, now you've
19   amended it again.  I mean this is like amending
20   the complaint.  I mean somebody comes in and says
21   I want to amend my complaint.  All right, I'll
22   give you a chance to amend your complaint.  Okay,
23   now they come back.  It's still no good.  Well,
24   give me another chance.  Okay, here's another
25   chance.  And that's where we are, is it not?
```

**Exhibit C**

```
 1              MS. CENDALI:  There's only been a
 2    single motion to amend before you, your Honor,
 3    and --
 4              THE COURT:  I know that.
 5              MS. CENDALI:  But the point is they
 6    can't have --
 7              THE COURT:  But the point is -- the
 8    point is you've amended the complaint, you've
 9    amended the underlying contract, the Strategic
10    Alliance Agreement.
11              MS. CENDALI:  And we have the right to
12    do that under the Supreme Court's ruling.
13              THE COURT:  That's correct, but you've
14    amended that which in effect amends the complaint
15    because it changes the basis upon which the case
16    is brought.
17              MS. CENDALI:  Right, and if that's the
18    case --
19              THE COURT:  So there's one amendment,
20    two amendments, how many times do you get to
21    amend?
22              MS. CENDALI:  Your Honor, if we -- if
23    you -- they have just argued to you that you
24    should not consider the restated and amended
25    agreement because it wasn't in existence at the
```

Exhibit C

1    time of the original --

2              THE COURT:  Well, I can't care what

3    they say.  I mean, right, you've amended it,

4    you've amended this case --

5              MS. CENDALI:  So if the restated if you

6    want to deem --

7              THE COURT:  You've amended this case

8    twice now.

9              MS. CENDALI:  And if you want to deem

10   the restated and amendment before the court, then

11   we should have a discussion right now as to

12   whether the restated and amended agreement is

13   valid under the Silvers test or not.  We believe

14   that it is valid.

15             THE COURT:  Well, we're here because

16   they're saying you still don't have standing.

17             MS. CENDALI:  Right, and what they have

18   not articulated any reason why version three does

19   not convey standing.  Your point in your

20   tentative was --

21             THE COURT:  Well, except they have.

22   What you're trying to do is reverse court

23   decisions.  Other courts have said, well, you

24   don't have any standing, and you say, well, okay,

25   let me work on this agreement.  Well, you still

**Exhibit C**

1  don't have any standing.  Okay, well, let me work

2  on it some more.  So you're just trying to create

3  jurisdiction and you want to amend to keep

4  creating jurisdiction.

5          MS. CENDALI:  Your Honor, all we're

6  saying is that there has been no decision on

7  version three of the agreement.  As a result of

8  that, to prohibit us from ever re-filing this

9  case --

10          THE COURT:  Well, you've got other

11  cases you've filed.  There are other cases,

12  aren't there?  Is that the end then, are there no

13  more Righthaven cases after this?

14          MS. CENDALI:  Well, your Honor, you

15  would have to decide that the restated version

16  three which wasn't in existence as of the time

17  the case was --

18          THE COURT:  And, in fact, contradicts

19  the terms of the original agreement.

20          MS. CENDALI:  It doesn't contradict the

21  terms of the original agreement.

22          THE COURT:  Well, sure it does because

23  it says we intend to assign all the rights.

24  That's not what -- that wasn't in the first

25  agreement.

**Exhibit C**

```
 1            MS. CENDALI:  But that's consistent,
 2    there's no contradiction.
 3            THE COURT:  Well, sure, so then I don't
 4    need -- then we don't need to have the amendment
 5    because if there's no contradiction, then that's
 6    the same agreement.  I've got the same agreement
 7    in front of me I had before then.
 8            MS. CENDALI:  Your Honor, there has --
 9    on jurisdiction and standing there is no basis
10    for a decision --
11            THE COURT:  Well, no, no, you said
12    there's no contradiction.  There is a
13    contradiction.
14            MS. CENDALI:  There's not a
15    contradiction.  The intent of the parties was
16    always to --
17            THE COURT:  But the intent of the
18    parties is what they express.  We don't say, now
19    what did you intend?  Well, I intended really to
20    create a brand new hamburger to sell to
21    McDonald's.  Well, that's not what your agreement
22    says.  Well, that's what I intended.  And so the
23    intent of the parties is what they express.
24                They can't say, well, no, I know
25    what we said.  I know we said that we were going
```

**Exhibit C**

```
1    to create a car, build a car, but I meant to --
2    what we intended was I was going to create a
3    hamburger.  Well, I don't care what you say your
4    intent is, does it square with what the terms of
5    the agreement are?
6              MS. CENDALI:  And it does, your Honor.
7              THE COURT:  And it doesn't because you
8    didn't have the right to sue -- I'm sorry --
9    that's all you had was the right to sue.  You
10   didn't have the underlying copyright.
11             MS. CENDALI:  That's apparently your
12   view with regard to the original --
13             THE COURT:  Well, let's see, let me
14   call Judge Hunt and see if he agrees, and Judge
15   Dawson and see if he agrees, and Judge Whoever
16   and see if they agree.
17             MS. CENDALI:  But now we're talking
18   about the version three.
19             THE COURT:  No, now we're talking about
20   how that contradicts the first two.
21             MS. CENDALI:  It doesn't contradict it,
22   it amends it.  It changes it, it's a new set of
23   facts.
24             THE COURT:  It contradicts it.  It
25   doesn't contradict it so that you always have the
```

**Exhibit C**

53

```
1    right -- that you had all of the rights under the
2    copyright law, right, and you always had that.
3    Why did you amend it then?  Why did you amend it
4    once?  Why did you amend it twice if you already
5    had those rights?  There's no need to amend it,
6    is there?
7              MS. CENDALI:  We amended it because
8    other courts have found that there was a problem
9    with standing under the original and under the
10   second version and in order to moot any issue --
11             THE COURT:  Well, what did they find?
12   They found based on the language of the contract.
13             MS. CENDALI:  Under the first and the
14   second but not the third.
15             THE COURT:  Exactly, contradicted.
16   This contradicts the terms of the first and the
17   second.
18             MS. CENDALI:  But no court found
19   anything with regard to the third, your Honor,
20   and that's the key point.
21             THE COURT:  But this contradicts the
22   terms of the first and the second, does it not?
23             MS. CENDALI:  No, it doesn't, it
24   changes it.
25             THE COURT:  Well, sure it does.  It
```

**Exhibit C**

```
1    does because you didn't have these rights,
2    otherwise, why would you amend it if it didn't
3    contradict them?  You're contradicting it to try
4    to give us jurisdiction.  That's the only reason
5    you're amending it.  So let's amend it again,
6    let's amend it again.  Does it contradict?  Of
7    course, it does because under the first agreement
8    you didn't have any right to -- you didn't have
9    all the copyright rights that you are supposed to
10   have.  So then we'll change it.  So you changed
11   it.  That contradicts the terms of the first,
12   doesn't it?  Yes, it does, yes, it does.
13            MS. CENDALI:  It changes the change of
14   the first.
15            THE COURT:  Yes, it does, it does.
16            MS. CENDALI:  It changes the terms of
17   the first absolutely.
18            THE COURT:  It absolutely contradicts
19   it.
20            MS. CENDALI:  It's absolutely different
21   from the change of the first.
22            THE COURT:  Well, thank you, finally.
23            MS. CENDALI:  So it totally changes the
24   terms of the first agreement.
25            THE COURT:  And the second.
```

**Exhibit C**

1          MS. CENDALI:  And the second.

2          THE COURT:  That's right.

3          MS. CENDALI:  Absolutely, and so the

4    point is that third agreement has not been ruled

5    on.

6          THE COURT:  The point is you've already

7    amended it twice.  You're saying let me amend it

8    again, let me amend it again.  What about the

9    formation of Righthaven where counsel tells me

10   that in the formation documents they agree that

11   at the end of the litigation the copyright gets

12   returned to Stephens Media.  That contradicts the

13   terms of the third agreement.

14         MS. CENDALI:  No, it doesn't contradict

15   the terms of the third agreement.  Right now the

16   only party with standing to sue is Righthaven

17   because Stephens Media only has a nonexclusive

18   license to use the copyright.  So if you were to

19   decide that Righthaven had no ability even under

20   a new agreement that was not originally before --

21         THE COURT:  But answer my question.  I

22   can tell you're a lawyer.  You know, yeah, the

23   parameters of the paradigm are such that the

24   confluence of factors bearing on the -- what?

25   What in the world are you saying?  Answer my

**Exhibit C**

```
 1   question.

 2              MS. CENDALI:  What's you question, your

 3   Honor?

 4              THE COURT:  Should I have the court

 5   reporter read it back?  I mean obviously you

 6   weren't listening I guess.

 7              MS. CENDALI:  Forgive me, I don't

 8   understand it.

 9              THE COURT:  What about the formation

10   documents of Righthaven?

11              MS. CENDALI:  Right.  The formation

12   documents of Righthaven --

13              THE COURT:  They say that at the end of

14   litigation then the copyright reverts back to

15   Stephens Media.

16              MS. CENDALI:  Right, and that is not

17   antithetical with the -- in the SGS case, the

18   federal circuit case that I was discussing

19   earlier, the federal circuit said the fact that

20   an assignment provides for a right of reversion

21   does not mean that it's not a bona fide

22   assignment that gives the right to sue.  They

23   have cited no case law that that provision in the

24   operating agreement means that Righthaven --

25              THE COURT:  But I mean what we've got
```

**Exhibit C**

1    here are a series of amendments just trying to

2    give us jurisdiction.  That's the way it seems to

3    me.  I mean there's no other reason for these

4    amendments other than to try to create

5    jurisdiction.

6              MS. CENDALI:  But the fundamental

7    business deal has changed, it used to -- that the

8    original agreement Righthaven got much narrower

9    rights.  Now, under the new agreement it has all

10   right, title, and interest.  Stephens Media only

11   has a nonexclusive right to use, which doesn't

12   even give it standing to sue.  The copyright law

13   is clear that there's no standing to sue under

14   those circumstances.

15             Stephens Media has no ability to

16   make decisions on who can file a lawsuit or when.

17   It has no ability to get the copyrights back

18   whenever it wants it.  All the -- if you look at

19   the Silvers case and the Nafal case and the cases

20   that find it, under all the decisions in that

21   case under the third agreement, there's clearly a

22   grant of copyright to Stephens -- to Righthaven

23   and with it the right to sue.

24             THE COURT:  All right, I'm going to

25   grant the motion to dismiss, but it's always my

**Exhibit C**

1    preference to do it without prejudice.  So I'm

2    giving you -- but I'm telling you I'm running out

3    of patience with all of these amendments.  Now,

4    understand and don't be technical and say, oh, we

5    haven't amended the complaint before.  In effect

6    you have by amending the Strategic Alliance

7    Agreement, the agreement on which the lawsuit is

8    based.  So there we are.  So I'll dismiss it

9    without prejudice.

10              MS. CENDALI:  Thank you, your Honor.

11              MR. PULGRAM:  Could I have twenty-two

12   seconds, your Honor?

13              THE COURT:  Twenty-two, you got it.

14   And understand it's just -- I want people to have

15   their day in court.

16              MR. PULGRAM:  And we appreciate that,

17   your Honor, you've been very generous.

18              THE COURT:  And understand, too, none

19   of us has focused on this third incarnation, and

20   it may be Casper, the friendly ghost, or I don't

21   know what it is, but, you know, I'm just

22   reluctant to say, no, you are out of time, you're

23   out of luck.

24              MR. PULGRAM:  Then I'll take one minute

25   and twenty-two seconds.

**Exhibit C**

1          THE COURT:  Okay.

2          MR. PULGRAM:  All right, first with

3   respect to the third amendment, there are two

4   ways and two reasons why it doesn't matter.  The

5   first is that there's already a judgment that the

6   SAA did not create standing.  That is collateral

7   estoppel.  Now, the point I stood up to make is

8   this, counsel stated that the dismissals by the

9   other courts on the standing issue were -- was,

10  quote, without prejudice and with leave to amend.

11          I suggest that those decisions

12  be reviewed because they do not say that the

13  dismissal was without prejudice.  They do not say

14  that it was with leave to amend.  They say I

15  dismissed because there was no standing because

16  there was no ownership and as we looked at the

17  case earlier, that is a dismissal with prejudice

18  on the merits.  And so that's reason one why you

19  don't get to the third agreement at all.  This is

20  over.  It's been decided.  And the second

21  reason --

22          THE COURT:  Wait, wait, let me stop you

23  right there.

24          MR. PULGRAM:  Yes, yes.

25          THE COURT:  One thing you don't want to

**Exhibit C**

1  do is mislead a judge.

2          MR. PULGRAM:  Absolutely.

3          THE COURT:  You told me these were

4  without prejudice these other dismissals.  I mean

5  I've got this other case and these people have

6  been waiting patiently to --

7          MS. CENDALI:  Your Honor, if this is

8  helpful, under Federal Rule of Civil Procedure

9  41, in voluntary dismissals for lack of

10 jurisdiction is deemed a dismissal without

11 prejudice unless the court expressly states

12 otherwise.  That's what Federal Rule of Civil

13 Procedure 41 says.  There's nothing as far as I

14 know in any of these opinions that says, that

15 states, that it's with prejudice.

16          THE COURT:  Well, you didn't say that

17 before, did you?

18          MS. CENDALI:  So that's --

19          THE COURT:  You didn't say that before,

20 did you?

21          MS. CENDALI:  I did --

22          THE COURT:  You did not say that

23 before, did you?  Rule 41 says that, you didn't

24 tell me that before.  You're relying on Rule 41,

25 is that what you're telling me now?

**Exhibit C**

1          MS. CENDALI:  Yes, it's none of them

2     say they're with prejudice, that means they are

3     without prejudice.

4          THE COURT:  You didn't say that before.

5     You said these are dismissals without prejudice.

6     So I'm looking here to see were they without

7     prejudice or with prejudice and you're saying,

8     well, no, I'm relying on Rule 41.  Why didn't you

9     tell me that before?  All right, go ahead.

10          MR. PULGRAM:  So Rule 41 is not the

11     rule that applies when you have a determination

12     of standing and ownership which is a

13     determination on the merits.

14          THE COURT:  I understand.

15          MR. PULGRAM:  Second, regardless of the

16     fact that these agreements are completely -- that

17     these amendments are foreclosed by the prior

18     decisions, we've gone through the reasons why all

19     of those contradictions mean they can't state a

20     claim.  And, therefore, it should be with

21     prejudice so we don't have to come in here and do

22     this again.  Thank you, your Honor.

23          THE COURT:  I appreciate it.  And again

24     my preference is just I want to be sure that

25     everybody gets their day in court and that we

```
 1    have and full and fair hearing.  None of us has
 2    really focused -- and by that I mean the parties
 3    either.  I mean you've discussed it more than any
 4    of the courts have, but it's just I want
 5    everybody to have a fair shake at it.
 6                    So I'm going to order this
 7    dismissal without prejudice, all right?
 8              MS. CENDALI:  Thank you, your Honor.
 9              THE COURT:  Thank you.  We'll in be
10    this recess.  Oh, Mr. Pulgram, now let me put the
11    burden on you to prepare an appropriate order if
12    you would, please.
13              MR. PULGRAM:  We will, your Honor.
14              THE COURT:  And I realize it's not
15    your -- your preference was with prejudice, but
16    prepare an appropriate order and submit that, if
17    you would, please.
18              MR. MANGANO:  Could I review that?
19              THE COURT:  Pardon me?
20              MR. MANGANO:  Could I review that
21    before it's submitted?
22              THE COURT:  Yeah, but understand they
23    win, they prevailed.  So I mean I'm not going to
24    say, oh -- I mean I won't let them misstate
25    anything, but I'm not inclined to give you a lot
```

**Exhibit C**

63

1   of leeway.

2           MR. MANGANO:  No, I understand.

3           THE COURT:  But, yeah, run it by Mr.

4   Mangano, please.

5

6           (Whereupon, the proceedings concluded.)

7

8

9

10

11           I hereby certify that pursuant
12   to Section 753, Title 28, United States Code, the
     foregoing is a true and correct transcript of the
13   stenographically reported proceedings held in the
     above-entitled matter.
14

15   Date:  August 29, 2011        /s/ Joy Garner
                                    JOY GARNER, CCR 275
16                                  U.S. Court Reporter

17

18

19

20

21

22

23

24

25

──────────JOY GARNER, CCR 275──────────
LAS VEGAS, NEVADA  (702)384-3188

**Exhibit C**